Christina C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FRICKE-PARKS PRESS, INC., JUSTIN LARDINOIS, and VINCENT CENDEJAS, individually and behalf of all others similarly situated<br><br>        Plaintiffs,<br><br>    v.<br><br>SK ENERGY AMERICAS, INC.; SK TRADING INTERNATIONAL CO. LTD.; VITOL INC.; and DOES 1-50,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, on behalf of themselves and all others similar situated, bring this class action for treble damages and equitable relief under the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.

## **INTRODUCTION**

1.      In February 2015, an explosion occurred at a gasoline refinery in Torrance, California. Defendants, the oil and gas companies SK Energy Americas, Inc. ("SK Energy"), SK Trading International Co., Ltd. ("SK Trading") (collectively "SK"), and Vitol Inc. ("Vitol"), took advantage of the resulting temporary supply shortage to maintain artificially high gas prices through illegal agreements and conduct.

2.      Plaintiffs are California consumers who purchased gasoline at gas stations in California after the Torrance refinery incident. Defendants' anticompetitive price manipulation after the incident caused Plaintiffs—and the other California gas purchasers who make up the proposed class in this action—to pay supra-competitive prices at the pump for many months after the market effects of the Torrance explosion subsided.

3.      At the time of the explosion, the Torrance refinery produced about 10% of California's refined gasoline. After the explosion, Defendants entered into contracts to sell refined gasoline in California and, pursuant to a horizontal agreement among them: (1) artificially increased the prices for refined gasoline sold in California; and (2) maintained those prices at artificially high levels.

4.      Defendants acted unlawfully for their own profit and to the detriment of gasoline purchasers statewide. Defendants acted in concert to artificially raise the spot price—the prevailing price to purchase physical supplies—of gasoline through a complex series of coordinated trading activities, including: (1) engaging in sham transactions to obfuscate the true nature of the supply and demand dynamic in California's gasoline market; (2) trading with each other with the purpose and effect of creating spikes in the spot market price; and (3) entering into prearranged, unreported buy and sell transactions with each other to share profits from the scheme. All of these acts were committed in furtherance of an antitrust conspiracy to raise, fix, and maintain the published spot market price of gasoline, eliminate market risk, conceal the scheme, and share unlawfully gained profits.

5.      Defendants' conduct was effective and worked its way from the spot market to the price Californians like Plaintiffs paid at the pump. Gas prices in Californians have historically been approximately 30 cents a gallon more than the national average. Beginning immediately after the crisis precipitated by the Torrance refinery explosion, however, Californians paid a premium of well over 50 cents over the national average, and continued to do so until well after the explosion's effects on supply had dissipated.

6.      In a November 2017 article concerning the "unexplained differential" between prices in California and the national average following the Torrance explosion, the *Los Angeles Times* reported that while the price differential was expected to return to the 30-cent range after the refinery came back online, "[t]he Torrance refinery, now owned by PFF Energy, came back online in May 2016—and statewide prices are still out of whack for the rest of the country. That's different from what happened after an August 2012 fire at Chevron's refinery in Richmond, Calif. Then, prices returned to their normal relationship with the U.S. average within about four months." The same article quotes Consumer Watchdog to the effect that California gas consumers were being price gouged: "There's a debate about how much we're getting gouged, but there's no debate that we are getting gouged."

7.      On May 4, 2020, following an investigation by the California Attorney General's Office, California Attorney General Xavier Becerra filed a complaint against these Defendants alleging that they "participated in a scheme to drive up and manipulate the spot market price for gasoline so that they could realize windfall profits on these large contracts to deliver gasoline and gasoline blending components." According to the California AG's complaint, the Defendants reached agreements with each other "to manipulate, raise, fix, and tamper with the spot market price of gasoline in California" and "to share the profits and disguise or hide the nature of the scheme." By doing so, Defendants both augmented and prolonged the harmful effects of the scheme on competition and consumers.

8.      Defendants and their co-conspirators caused the price of gasoline to increase above the price that would have prevailed in a transparent, competitive market. As a result, Plaintiffs paid anticompetitive overcharges on their gas purchases. They accordingly seek treble damages under California antitrust law for themselves and the class of other similarly situated purchasers.

CLASS ACTION COMPLAINT
CASE NO.

**JURISDICTION AND VENUE**

9.      This Court has diversity jurisdiction under 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the amount in controversy is in excess of $5,000,000, excluding interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

10.     This Court has personal jurisdiction over Defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) are registered to do business in the state of California; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants do business in this District.

12.     Assignment to the San Francisco or Oakland Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in San Francisco County.

**PARTIES**

A.      **Plaintiffs**

13.     Fricke-Parks Press, Inc. is a California corporation with its principal place of business in Union City, California. Fricke-Parks Press purchased gasoline within California between February 2015 and December 2017.

14.     Justin Lardinois is a citizen and resident of San Jose, California. Mr. Lardinois purchased gasoline within California between February 2015 and December 2017.

3

CLASS ACTION COMPLAINT
CASE NO.

15.     Vincent Cendejas is a citizen and resident of California. Mr. Cendejas purchased gasoline within California between February 2015 and December 2017.

**B.      Defendants**

16.     Vitol is a Delaware corporation with its principal place of business in Houston, Texas. Vitol operates a trading firm and is a subsidiary of Vitol Holding, B.V., an international energy and commodities company based in the Netherlands.

17.     SK Energy is a California corporation with its principal place of business in Houston, Texas. During the relevant time period, SK Energy functioned as SK Trading's California trading operation.

18.     SK Trading is a South Korean corporation with its principal place of business in Seoul, South Korea. SK Trading is the parent of SK Energy International and the indirect parent of SK Energy.

19.     SK Energy and SK Trading are subsidiaries of SK Innovation Co., Ltd., a South Korean energy company with its principal place of business in Seoul, South Korea.

20.     The SK entities were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.

**C.      The Doe Defendants**

21.     DOES 1-50 are other individuals or entities who engaged in or abetted the unlawful conduct set forth in this complaint. Plaintiffs intend to seek leave to amend this complaint upon learning the identity of these Doe Defendants.

**D.      Agents and Co-Conspirators**

22.     Throughout the relevant time period, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes and transactions that are the subject of this complaint. Defendants have participated as members of the conspiracy or acted with or in furtherance of it, or aided or assisted in carrying out its

CLASS ACTION COMPLAINT
CASE NO.

purposes alleged in this complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable relief on behalf of the following Class:

> All persons who purchased refined gasoline at retail in California from February 18, 2015 until the effects of defendants' anticompetitive conduct ceased (the "class period"). Excluded from the class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, and all jurors in this case.

24.     The number of class members is so large that individual joinder of all members of the class is impracticable. Plaintiffs believe that there are several million class members who are geographically dispersed throughout the State of California.

25.     Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual class members. Among the questions of law and fact common to the class are:

a.     Whether Defendants and their co-conspirators manipulated the market for the sale of refined gasoline in California;

b.     Whether Defendants and their co-conspirators entered into agreements to set and maintain the price of refined gasoline in California by engaging in trading activity designed to artificially increase the refined gasoline spot price;

c.     Whether Defendants had knowledge of the manipulation;

d.     Whether Defendants took advantage of the manipulation to charge excessive, supra-competitive prices for the sale and distribution of refined gasoline in California;

e.     Whether Defendants' conduct violates the Cartwright Act, Business and Professions Code section 16700 *et seq*.;

f.   Whether Defendants' conduct violates the Unfair Competition Law, Business and Professions Code section 17200, *et seq*.;

g.   Whether Plaintiffs and other members of the class were injured in their business or property by reason of Defendants' unlawful conduct;

h.   The measure of damages suffered by Plaintiffs and other members of the class; and

i.   Whether Plaintiffs and the members of the class are entitled to restitution or other equitable relief under the Unfair Competition Law.

26.   Plaintiffs' claims are typical of the claims of the members of the class, and Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the class. Plaintiffs and all members of the class purchased refined gas during the class period and seek relief based on the same legal theories. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other class members, and Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

27.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## FACTUAL ALLEGATIONS

### A.   Overview of California's Refined Gasoline Market

28.   According to the California Department of Energy, gasoline is the most used transportation fuel in California. In 2015, 15.1 billion gallons of gasoline were sold to California drivers. As the country's most populous state, and the state with the most licensed drivers and registered vehicles, California has a high demand for refined gasoline.

CLASS ACTION COMPLAINT
CASE NO.

29.     In addition to having a significant need for refined gasoline, California's refined gasoline market is also unique compared to the bulk of the United States.

30.     Geographically, California is remote from the oil refining hotbeds in Texas and the Gulf Coast. According to research performed by Fueling California, because there are no pipelines linking California to petroleum or crude oil supplies, "[t]he state must import an increasing share of fuel from shrinking domestic and distant international sources both overland and by sea."

31.     California also has specific regulations that require special blends of refined gasoline and differentiated fuel standards. Under the California Reformulated Gasoline Regulations, refined gasoline consumed in California must be produced according to special, low-emissions specifications. As a result of these regulations, California refined gasoline must meet the "California Reformulated Gasoline Blendstock for Oxygenate Blending, or "CARBOB"  standard. Because California uses a special blend of refined gasoline, most CARBOB compliant gasoline is produced in California, and when there is a shortage of CARBOB compliant gasoline, it cannot readily be replaced by non-CARBOB refined gasoline.

32.     Because of the unique characteristics of California's refined gasoline market, Californians have historically paid approximately 30 cents extra per gallon of refined gasoline in comparison to drivers in other states.

**B.     The Torrance Refinery Explosion and Its Fallout**

33.     On February 18, 2015, a large explosion occurred at the ExxonMobil refinery in Torrance, California. While the Torrance refinery is ExxonMobil's second smallest statewide, it sells 5 million gallons of low emissions gasoline a day in Southern California, Arizona, and Nevada, and produces approximately 20% of the gasoline sold in Southern California and 10% of the gasoline sold state-wide.

34.     According to the *Los Angeles Times*, the explosion "crippled" the refinery, causing it to operate at a significantly reduced capacity. The result was an unplanned shortage of refined gasoline meeting California's standards, and that shortage affected gas prices throughout the state.

CLASS ACTION COMPLAINT
CASE NO.

35.     The Torrance refinery explosion occurred in a part of the refinery's fluid catalytic cracking or "FCC" unit, which comprised a core portion of the complex that produces both gasoline and other products like alkylate, a blending component used in premium refined gasoline.

36.     Because of the shortage caused by the Torrance refinery explosion, California's supply of CARBOB gasoline and blending components like alkylate fell below the levels needed to satisfy demand. To make up for the shortfall, California had to look to a greater degree to outside sources of refined gasoline, like Defendants Vitol and SK, which sold gasoline and the components needed to refine it to satisfy California requirements.

**C.     The Fuel Price Influence Chain**

37.     Fuel is traded on both physical or "spot" markets where physical delivery of refined gasoline occurs, and paper or "futures" markets where traders purchase contracts to buy or sell gasoline at a future date.

38.     According to the Oil Pricing Information Service or "OPIS," the paper or futures market is run through the New York Mercantile Exchange, or OPIS. Trades on NYMEX are anonymous, and guarantee counterparty performance.

39.     The paper market is used as a way to hedge (offset the risk of adverse price movements for) physical fuel purchases, and is a central factor in dictating downstream gasoline prices.

40.     OPIS defines spot fuel purchases as "fuel that is physically traded either on a pipeline or on the water (via barge)." It is called "spot" because traders can negotiate for the fuel "on the spot." Unlike on the paper market, when gasoline is traded on the spot, the product physically changes hands— as OPIS puts it, "Refiner X sells diesel to end-user Y to put in a tank at location Z." Spot market deals are always bulk deals—pipeline deals are for a minimum of 5,000 barrels and up to 50,000 barrels.

41.     The spot markets are located in hubs around the United States, with the West Coast hubs located in Los Angeles, San Francisco, and the Pacific Northwest, as shown below.

CLASS ACTION COMPLAINT
CASE NO.

42.    Spot market buyers and sellers include refiners, who produce fuel and may need to buy or sell based on existing supply and demand; traders, i.e., speculators who bet on market trajectory and take corresponding physical positions based on those bets; brokers, who match buyers to sellers and take positions; and end-users, which are fleets, truck-stops, or other market participants that wish to supplement their "rack" purchases with spot purchases.

43.    Spot price per gallon fluctuates and is linked to the NYMEX price per gallon. According to OPIS, "[e]very major U.S. refine products market adheres back in some way to a product on the NYMEX, with basis forming the glue between them." So spot transactions for refined products are not executed on a flat basis, like $4.000/gallon, but instead are executed based on a relationship to a related commodity on the NYMEX, called a differential to the cost basis. For example: $1.50 (NYMEX ROBOB basis) + 20 cts (Differential) = $1.70 (actual spot price).

44.    While NYMEX and the spot market are linked, local incidents like the Torrance explosion can and do swing the relationships between the prices up or down—when an event like the Torrance explosion occurs, according to OPIS, the "Los Angeles market can widen CARBOB premiums to the NYMEX and send local spot prices flying in excess of what the MERC is doing."

45.    From the spot market, fuel is distributed from a fuel distribution point called a "rack," which is where fuel is supplied. An image of a rack is below.

9

CLASS ACTION COMPLAINT
CASE NO.

46.    Rack transactions are much smaller than spot transactions and are generally in "truck or trailer" quantities of approximately 8,000 gallons. Rack customers include fuel resellers like distributors, retailers, and end-users.

47.    Rack prices are directly linked to spot prices. And, if the fuel price influence chain is working as it should, when refiners have a need for more fuel, they can make up the difference by purchasing on the spot market. The replacement gasoline purchased on the spot market is then sold on the rack. Per OPIS, "refiners increase or decrease their daily rack costs based on the average daily change in their spot replacement costs." Spot fluctuations are thus passed through to the rack costs.

48.    According to OPIS, the only charges included in a rack price are charges that are incurred from transporting fuel from the refinery to the distribution rack.

49.    Retail prices paid to gas stations for refined gasoline flow directly from the rack price, with federal, state, and local taxes added in, and with an additional margin built in.

50.    Because retail prices are linked directly to the rack price, which fluctuates based on the spot price, the spot price of refined gasoline dictates the price paid by consumers at the pump.

51.    The below image from OPIS summarizes the fuel price influence chain.

CLASS ACTION COMPLAINT
CASE NO.



52.     In California, spot market trades for refined gasoline are conducted through private, over-the-counter trades. Prices, therefore, are not public. Instead, subscription price reporting services like OPIS publish weekly spot prices.

53.     Because many gasoline contracts use a floating price to be determined at a future date, the OPIS reported price can determine the price of refined gasoline. According to OPIS's West Coast Spot Market Report website, "nearly every gallon of gasoline, diesel and jet fuel sold on the West Coast references OPIS spot prices, making it an essential price reference for anyone doing business in the region."

54.     OPIS obtains its price data directly from market participants, who submit their trading info to OPIS, which then derives a spot price by aggregating reported trading data. Thus, voluntarily reported trading data plays a critical role in dictating OPIS reported daily spot prices.

**D.     Regulations Governing California Spot Market Trading**

55.     California spot market trading is governed by California's commodities fraud statute, which provides, among other things, that "willfully employ[ing] any device, scheme, or artifice to defraud," in connection with the purchase or sale of commodity contracts is unlawful. Corp. Code § 29536(a)–(d).

56.     The Federal Commodity Exchange Act similarly prohibits transactions that are: (1) "of the character of, or commonly known to the trade as, a 'wash sale' or 'accommodation trade'"; and (2) "used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." 7 U.S.C. § 6c.

**E.     Defendants' Participation in the California Spot Market**

57.     Both SK and Vitol actively traded refined gasoline in California during the class period. Defendants both bought and sold spot contracts for refined gasoline, and imported gasoline and gasoline blending components into California during the class period.

58.     **Vitol.** Vitol employee Brad Lucas held the title "USWC Trader." Lucas was the primary trader at Vitol with responsibility for trading gasoline and gasoline blending components that were delivered via pipeline within California.

59.     Lucas reported to John Addison, a Vitol executive who in turn reported to the President of Vitol Americas. In addition to supervising Lucas, Addison had trading responsibility that included trading gasoline and gasoline blending components that were primarily delivered via marine vessels to West Coast locations, including in California.

60.     **SK.** SK Energy employee David Niemann was the senior trader responsible for executing trades on the West Coast, including California. Another SK Energy employee, Shelly Mohammed, filled the role of gasoline scheduler and was Niemann's subordinate.

61.     SK Energy functioned as the California trading arm of SK Trading. While Niemann and Mohammed were nominally employees of SK Energy, SK's West Coast trading business was conducted under the control and supervision of SK Trading, acting for itself and through its wholly-owned subsidiary, SK Energy International.

62.     Lucas and Niemann had ample opportunities to collude throughout the duration of the wrongful conduct outlined in this complaint, via instant messaging, emails and telephone calls, as well as at in-person meetings, dinners, and drinks.

**F.     Vitol and SK Colluded to Unlawfully Manipulate the California Market for Refined Gasoline**

63.     Niemann began working for SK in August 2014 and immediately began trading gasoline contracts on the California spot market. Before starting work at SK, Niemann held a similar trading role at Vitol. Niemann and Lucas worked at Vitol during the same time period, and after leaving Vitol, Niemann stayed in communication with Lucas and other Vitol employees. As of February 2015,

Niemann became SK's senior trader responsible for California trading and Lucas filled a similar role at Vitol.

64.     Beginning in late 2014, Vitol and SK reached an agreement to coordinate their West Coast refined-fuel trading activities, including in California, and concealed their agreement from other market participants. This scheme to engaged in concerted action was expanded in 2015 to include premium refined gasoline.

65.     Immediately after the February 18, 2015 Torrance explosion, Defendants, through Niemann and Lucas, entered into agreements with one another and third parties in furtherance of a scheme to fix, raise, maintain and otherwise manipulate the price of refined gasoline in California.

66.     The scheme relied on various spot market trading tactics geared toward manipulating the OPIS reported spot price during pricing windows for large contracts in order to reap supra-competitive profits and limit risk.

67.     While Defendants used myriad trading tactics in furtherance of their scheme to inflate the OPIS reported price, the core of the scheme was: (1) engaging in trades at inflated values to manipulate the OPIS price; and (2) engaging in facilitating trades to disguise the scheme, limit market risk, and share profits with one another.

68.     Defendants' illicit trading activities designed to increase price included the following:

- **Inflating trades.** During key date ranges affecting pricing windows for large contracts, Vitol and SK engaged in transactions which they selectively reported to OPIS to increase and stabilize the OPIS-reported price. The transactions were executed both directly and using the services of intermediary brokers. These activities—including offers to buy and sell—were specifically intended to affect the OPIS-reported price and did so.

- **Loss-leader transactions.** Defendants executed leveraged loss-leader transactions (low priced sales of a small quantity of product designed to attract customers). While Defendants took losses on the smaller amounts of gasoline sold at loss-leader prices, they did so to increase their profits on their sale of larger quantities of refined gasoline or alkylate during times when they had artificially inflated the OPIS-reported price.

CLASS ACTION COMPLAINT
CASE NO.

- **High deal of the day trades.** Defendants executed market inflating trades by intentionally bidding up the OPIS-reported price, often resulting in the market-spiking trade being the highest deal of the day. By making such "high deal of the day" trades, Defendants increased the average OPIS-reported spot price and gave market participants the false impression of sustained strong demand to further stabilize the high pricing.

- **First deal of the day trades.** Defendants also executed "first deal of the day" trades in which they made the first trade of the day at inflated prices during key pricing windows. Trading early in the day, at inflated prices, made it more likely that OPIS would report the inflated price trade to other market participants, again creating the false impression of artificially high demand and discouraging other participants from submitting offers below the price for the first deal of the day.

- **Premium market-spiking trades.** Defendants executed abnormal market-spiking trades of premium with third parties and one another, increasing the market price of premium by ten cents or more in a day. The trades were effective given that there are generally far fewer premium trades daily than regular trades. Defendants' collusive premium trades were designed to and did increase the price of alkylate, which is not a separately reported commodity on California's spot market, and whose price is thus commonly tied, with a small differential, to the OPIS-reported price for premium.

69.     Defendants' illicit trading activities designed to facilitate their ongoing scheme to control price included the following:

- **Reverse wash trades.** After an OPIS-reported trade, Defendants executed a second trade in the opposite direction of the OPIS-reported trade, distorting the perception of supply and demand and the *bona fide* spot price. Such trades would ensure that no gasoline actually would exchange hands as a result of the first, OPIS-reported trade that artificially drove up the OPIS-reported price. Such trades often were not reported to OPIS, so as to hide Defendants' market manipulation. These trades were pre-planned and mitigated risk by limiting the total exposure Defendants faced as a result of their panoply of manipulative transactions.

14

CLASS ACTION COMPLAINT
CASE NO.

- **Preplanned short positions.** Defendants' wash trades could also occur before the OPIS-reported trade. For example, before an OPIS-reported pricing window, Defendants took pre-planned short positions, thereby locking themselves into buying during the relevant pricing window. When they went on to buy gasoline to increase OPIS-reported prices and cover their short position, other market participants saw an artificial increase in demand. Consequently, these short transactions were a key aspect of Defendants' scheme to control market pricing.

- **Unreported profit-sharing trades.** Defendants also executed *unreported* trades to share profits from their scheme. Vitol and SK entered into prearranged buy and sell contracts with each other to transfer money—not gasoline.

70.     Further, Defendants entered into agreements with each other to carry out this scheme that were described as "joint ventures" but which, in reality, were unlawful agreements to raise and fix prices in the California gasoline market and, through their conduct, to reap and share in windfall profits.

71.     Defendants' coordination began with regular gasoline in late 2014 and then expanded to include premium in February 2015. Later in 2015, Defendants expanded their agreements to cover alkylate. Under their alkylate agreement, Vitol or SK imported alkylate cargo and then colluded to increase profits from selling the alkylate at high prices while concealing their multifaceted cooperation.

72.     Defendants' agreements to coordinate gasoline trading activities and to share the profits from alkylate cargoes also prevented competition between Vitol and SK for those products.

**G.     Defendants' Scheme Subjected California Consumers to Supra-Competitive Retail Gasoline Prices**

73.     Defendants' scheme worked. They were able to capitalize on the Torrance explosion, inflate California retail gasoline prices above competitive levels, and maintain supra-competitive pricing until well after the Torrance refinery came back online in May 2016.

74.     While Defendants' conduct was directed at manipulating the spot price of refined gasoline, the spot price translates directly into the retail price of gasoline paid by California consumers, as described above in Section I.C. Thus, Defendants' conduct at issue caused California consumers like Plaintiffs to pay more for refined gasoline than they otherwise would have.

CLASS ACTION COMPLAINT
CASE NO.

75.     Historically, California gasoline prices have hovered at around 30 cents a gallon more

than the national average. When there have been similar incidents, such as the August 2012 fire at

Chevron's refinery in Richmond, California, gas prices in California returned to their normal

relationship with the U.S. national average within about four months. After the Torrance incident,

California gas prices remained at levels substantially above the historic average through 2016 and into

2017.

76.     The below graph shows that, whereas the spike in California gasoline prices in late 2012

caused by the Chevron refinery subsided by January 2013, after the February 2015 spike the California

prices remained inflated at supracompetitive levels through 2016 and 2017:



77.     In November 2017, the *Los Angeles Times* reported on the then-unexplained continuing

impact of the Torrance refinery explosion:

> Estimates of the mysterious premium being collected by the state's
> refineries range from at least 20 cents per gallon—as calculated by UC
> Berkeley energy economist Severin Borenstein—to more than 30 cents, as
> reckoned by the advocacy group Consumer Watchdog. . . . The lower
> estimate would take about $3 billion a year out of California drivers'
> pockets, or about $300 a year for an average family of four; the higher
> estimate, $4.5 billion.

CLASS ACTION COMPLAINT
CASE NO.

78.    After the Torrance explosion, the California Energy Commission sought analysis of these gas prices from its Petroleum Market Advisory group. That group, however, was under-resourced and unable to come up with an explanation. Even so, its final report noted the "unexplained differential" between prices in California and the national average that persisted even upon accounting for the unique features of the state's gasoline market. According to the report, "[u]nlike the Richmond/Torrance Refinery event, the differentials in 2015 Torrance Refinery event did not spike just once, but three times, roughly corresponding to increases in retail gasoline prices in California."

79.    The below image, drawn from the report, demonstrates the outsized and lasting California price increase that followed the Torrance explosion.



Source: U.S. Energy Information Administration

80.    The purple line at the bottom shows a significantly higher differential between California and other U.S. gas prices during the period of Defendants' conspiracy.

81.     The California Energy Commission report concluded that Californians may have paid at least $12 billion in extra gas costs due to the "unexplained differential" since the 2015 Torrance fire.

### H.     The California Attorney General Action

82.     On May 4, 2020, California Attorney General Xavier Becerra announced the filing of a lawsuit against Defendants for alleged manipulation of California's gas prices resulting in artificially inflated retail gasoline prices. The AG's suit alleges that Defendants seized on the market disruption caused by the Torrance refinery explosion to drive up gas prices and keep them at supracompetitive levels.

83.     The AG's suit alleges that Defendants' engaged in market manipulation through trades that were:

> selectively reported to the Oil Price Information Service, LLC (OPIS)—the most widely used gasoline reporting service in California—in order to drive up the benchmark prices of Regular and Premium gasoline in OPIS's Spot Market Report. The companies, through two traders who were friends and former colleagues, colluded to drive up the price of OPIS-reported trades during pricing windows for large sales in order to increase the price of gasoline in the state to their profit. The firms engaged in unusual and otherwise irrational market-spiking trades with each other and third parties that had the effect of driving up prices prior to large trades—and they were successful in doing so, artificially moving and inflating the price of Regular and Premium gasoline so effectively that the prices moved or stayed unaccountably higher than the supply and demand prevailing . . . . By driving up benchmark prices, the companies were able to sell their own product at a higher price, and inflate costs for consumers.

### I.     Tolling of the Statutes of Limitations

#### 1.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

84.     Plaintiffs and class members had no knowledge of Defendants' combination or conspiracy, or of facts sufficient to place them on inquiry notice of the claims set forth herein during the class period and continuing thereafter.

85.     Plaintiffs and class members purchased refined gasoline at prices that were artificially inflated as a result of Defendants' unlawful agreement to manipulate the California refined gasoline

CLASS ACTION COMPLAINT
CASE NO.

market. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy.

86.     Throughout the class period, and continuing thereafter, no information in the public domain was available to Plaintiffs and class members that revealed sufficient information to suggest that any of the Defendants was involved in an unlawful scheme to raise, fix, maintain and stabilize retail prices for refined gasoline.

87.     It was reasonable for Plaintiffs and class members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior.

88.     Plaintiffs allege a continuing course of unlawful conduct by and among Defendants, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

89.     For these reasons, the statutes of limitations applicable to Plaintiffs' and class members' claims have been tolled with respect to the claims asserted herein.

### 2.     Defendants' Fraudulent Concealment Tolled the Statute of Limitations

90.     Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. Plaintiffs and class members had no knowledge of the combination or conspiracy alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims, during the class period and continuing thereafter. No information in the public domain or otherwise available to Plaintiffs and the class during the class period suggested that Defendants were involved in an unlawful scheme to artificially inflate and maintain refined gasoline prices in California.

91.     Defendants concealed their scheme by not disclosing that they were conspiring to manipulate California refined gasoline prices, and also through the obscure facilitating trading activity described herein. Defendants' scheme also was inherently self-concealing because, as Defendants knew, its disclosure would have led to governmental enforcement activity or civil liability. Refined gasoline is subject to antitrust and unfair competition law regulation, so it was reasonable for Plaintiffs and class members to presume that California refined gasoline was being sold in a competitive market. A

1    reasonable person under the circumstances would not have had occasion to suspect that refined gasoline

2    was being sold at supra-competitive prices at any time during the class period.

3        92.    Because Defendants' scheme was self-concealing and affirmatively concealed by

4    Defendants, Plaintiffs and class members had no knowledge of the conspiracy or of any facts or

5    information that would have caused a reasonably diligent person to suspect a conspiracy existed during

6    the class period.

7        93.    Therefore, by operation of Defendants' fraudulent concealment, the statutes of limitations

8    applicable to Plaintiffs' and class members' claims were tolled throughout the class period.

9                    **<u>FIRST CAUSE OF ACTION</u>**

10                   **Violations of the Cartwright Act,**
                    **Bus. & Prof. Code § 16720 *et seq*.**

11                       **(Against All Defendants)**

12       94.    Plaintiffs incorporate by reference and reallege each paragraph above, as though fully set

13   forth herein, and assert this claim against all Defendants. Plaintiffs bring this cause of action on behalf

14   of themselves and the class.

15       95.    Beginning at a date presently unknown to Plaintiffs, but commencing no later than the

16   beginning of the class period, and continuing thereafter uninterrupted, Defendants and their co-

17   conspirators engaged in an agreement, trust, contract, combination or conspiracy to fix, raise, elevate,

18   stabilize and maintain at supracompetitive levels the price of refined gasoline sold at retail in the state of

19   California to Plaintiffs and members of the class. The overt acts and practices in furtherance of this

20   alleged agreement, trust, contract, combination or conspiracy include, among other things, the acts

21   alleged above.

22       96.    The combination and conspiracy consisted of a combination, agreement, understanding

23   and concert of action among Defendants and their co-conspirators, the substantial terms of which were

24   to fix, raise, maintain and stabilize the retail price of refined gasoline sold in the State of California at

25   supra-competitive levels.

26       97.    For the purpose of forming and effectuating the aforementioned combination and

27   conspiracy, Defendants and their co-conspirators did those things which they agreed, and conspired to

28   do, including among other things:

                                20
                    CLASS ACTION COMPLAINT
                        CASE NO.

    a.  raising, fixing, stabilizing and maintaining the price of refined gasoline in California;

    b.  engaging in coordinated market-spiking trading activity in order to cause the spot price of refined gasoline to increase;

    c.  engaging in facilitating and wash trades in order to obfuscate market dynamics, conceal their scheme, and share profit;

    d.  reporting pricing information resulting from their unlawful trading activity to OPIS; and

    e.  entering into agreements to raise, fix, stabilize, and maintain the price of refined gasoline in California.

98.    In formulating and effectuating the agreement, trust, combination and conspiracy, Defendants and their co-conspirators committed the acts that they combined and contracted to do as part of their illegal scheme, including, but not limited to, discussing, exchanging, and deciding among themselves, and acting in accordance with their agreement to artificially inflate and maintain the price of refined gasoline in California.

99.    These activities resulted in a restriction of free competition among traders and sellers of refined gasoline and further resulted in Defendants and their co-conspirators earning substantially higher profits than they would have been able to earn in a competitive marketplace.

100.    Defendants' combination and conspiracy had the following effects, among other things:

    a.  buyers of refined gasoline were deprived of competitively priced refined gasoline;

    b.  competition for the right to buy refined gasoline was restrained, suppressed, and eliminated; and

    c.  the prices of refined gasoline was raised, fixed, and maintained at artificially high and anticompetitive levels.

101.    Defendants' scheme constitutes a *per se* violation of the Cartwright Act.

102.    As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators in violation of the Cartwright Act, Plaintiffs and class members were injured in their business and property in that they paid more for refined gasoline than they would have paid in the absence of this unlawful conduct. Thus, as a direct and proximate result of Defendants' conduct,

CLASS ACTION COMPLAINT
CASE NO.

Plaintiffs and the class were damaged in an amount to be proven at trial, and Plaintiffs accordingly seek treble damages pursuant to section 16750(a) of the Act.

### SECOND CAUSE OF ACTION
**Violations of the Unfair Competition Law,**
**Bus. & Prof. Code § 17200 *et seq.***
**(Against All Defendants)**

103.    Plaintiffs incorporate and reallege each paragraph above, as though fully set forth herein, and assert this claim against all Defendants. Plaintiffs bring this cause of action on behalf of themselves and the class.

104.    Defendants, and each of them, individually, and in concert, engaged in unfair and unlawful business practices within the meaning of Business and Professions Code sections 17200 *et seq*.

105.    The unlawful, unfair and unconscionable business practices of Defendants, and each of them, as alleged herein, injured members of the public in that Defendants' conduct restrained competition and caused Plaintiffs and the members of the class to pay supracompetitive prices for refined gasoline.

106.    Defendants' conduct is unlawful, in violation of the UCL, because it violates the Cartwright Act as set forth above.

107.    Defendants' conduct is unfair in violation of the UCL because it violates California public policy, legislatively declared in the Cartwright Act, protecting and promoting competitive markets and prohibiting all trusts and combinations in restraint of trade.

108.    Defendants acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner by, among other things:

      a.   conspiring to fix, maintain, and stabilize the market for refined gasoline in California;

      b.   engaging in unlawful and deceptive trading activities, including market spiking transactions and facilitating wash trades;

      c.   reporting pricing information resulting from their unlawful trading activity to OPIS; and

      d.   entering into agreements to raise, fix, stabilize, and maintain the price of refined gasoline in California.

109.    The acts and practices of Defendants, and each of them, as alleged herein, constitute unlawful and unfair business practices in violation of Business and Professions Code sections 17200 *et seq*. in that their conduct is immoral, unscrupulous, anticompetitive, and contrary to public policy, and the gravity of the conduct detailed herein outweighs any benefit attributable to such conduct.

110.    The acts and practices of Defendants, and each of them, as alleged herein, whether or not concerted or independent acts, violate Business and Professions Code sections 17200 *et seq*.

111.    The acts and practices of Defendants, and each of them, as alleged herein, directly and proximately caused Plaintiffs and each member of the class to suffer injury in fact by paying supracompetitive prices for refined gasoline.

112.    Plaintiffs and each member of the class are entitled to appropriate relief, including restitution from Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) and direct that reasonable notice of this action, as provided under Rule 23(c)(2), be given to each member of the class;

B.    That the Court declare and decree that Defendants and their co-conspirators have entered into an illegal trust, combination and/or conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, and that Plaintiffs and the members of the class were damaged and injured in their business and property as a result thereof;

C.    That the Court award Plaintiffs and the members of the class all compensatory and general damages determined to have been sustained by them as a result of Defendants' conduct as complained of herein, and that joint-and-several judgments be entered against each Defendant for the amount so determined along with the trebling of said damages;

D.    That the Court award restitution through its equitable powers under the remedial provisions of Business and Professions Code sections 17200 *et seq*.;

E.    That the Court award pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit, including expert witness fees; and

CLASS ACTION COMPLAINT
CASE NO.

F.      That the Court grant such other and further legal and equitable relief, including exemplary damages, as this Court may deem proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial of all issues so triable.

Dated: May 7, 2020                             Respectfully submitted,

By: ___/s/ *Christina C. Sharp*_____

Christina C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT
CASE NO.